21-4110, Counsel for Appellant. If you'd make your appearance and proceed, please. Thank you. Good morning, Your Honors. Brian King for the Plaintiffs. May it please the Court, today we are addressing the needs and the propriety of denial of benefits for medical care that needed to be provided to a very sick young woman. She was treated at a couple of residential treatment centers when she was an adolescent, initially at Viewpoint Residential Treatment Center for two months that was covered by Health Net, and then upon the recommendation of the treatment team at Viewpoint, she went to Uintah Academy. She had been diagnosed with persistent depressive disorder, with generalized anxiety disorder, with serious eating disorder, ADHD, and a number of other mental health and behavioral issues. She, the folks at Health Net provided coverage for both Viewpoint and the first five months or so of her treatment at Uintah, and then they terminated the care saying that her treatment was not medically necessary under the inter-qual medical necessity criteria. It's undisputed, however, that the medical records themselves show that she remained what the medical records refer to as on arms, quote-unquote, for at least nine months when she was treated at Uintah, and that means that while she was eating and for about an hour after, she was in visual sight of clinicians there at the facility to make sure that she did not engage in eating disorder behavior. We drafted the complaint, filed it, and it has two causes of actions. The district court initially dismissed under Rule 12b-6 the claim involving the Mental Health Parity and Addiction Equity Act. I refer to that as MAPEA. It's a good question as to how that acronym is pronounced, but the folks at the Department of Labor pronounce it MAPEA. But we allege first and foremost that the MAPEA claim was wrongfully dismissed because the complaint satisfies our Rule 8 pleading standards and the pleading standards from the Supreme Court and this Tenth Circuit precedent for how we need to allege that cause of action, this MAPEA cause of action. I thought I would stumble less if I called it the Parity Act, and so I think I'm going to do that, at least for purposes of this oral argument. I may do something different in writing. Happy to follow your lead. Let me clarify one point, and I hope I can do this in this oral argument context cleanly enough. I want to understand what standard we should apply as it relates to the Parity Act. In other words, the test. It's my impression that the Tenth Circuit has not established a test for this statute. Is that your understanding? That's correct. Let me just recount what I understand to be the test from looking at the District Court decisions. Tell me if you're comfortable with this. One, you have to show coverage under the Act. Two, you have to identify specific treatment or limitation on mental health or substance abuse treatment. Three, you have to identify an analog, medical or surgical care analog. And four, you have to show the disparity. Are you comfortable with that as sort of essentially the elements that need to be shown on a test? I am, generally, Your Honor. I think that what we're talking about is a comparative statute. The mental health parity statute is something that requires parity between equivalent levels of care for both mental health and substance use disorders on the one hand, and on the other hand, analogous levels of care for medical and surgical treatment. I think it's fairly well established. I know a case law has been developed not just in Utah, which has probably most of these cases, but across the country, that the analog that we're looking at in this specific case for residential treatment is inpatient skilled nursing facility and inpatient rehabilitation. There's another argument about whether inpatient hospice falls into that. I don't feel the need to get into that today, but the idea that we need to look for analogs and compare these two things, how a benefit plan treats those two things, is at the heart of the parity statute. And as I understand your complaint, what you're arguing is that for physical ailments, they require symptoms, but for mental health issues, they require acute symptoms to justify subacute facilities. Am I understanding that correctly? That's correct. That's correct, Judge McHugh. They did in this case exactly what you described. We believe, we contend, that they used acute care criteria to analyze subacute treatment. And I think that's fairly well established in the complaint. And there's no question in our mind that HealthNet had fair notice that that's what we were saying. We had allegations from the denial letters as to what they were requiring in terms of symptomology that we believe was sufficiently specific as a factual matter to satisfy Rule 8. And so we just simply believe that the court got it wrong in dismissing the case, especially, Your Honors, we think that there is a problem with the dismissal in light of the fact that the family had requested these analogous levels of care and the medical necessity criteria for them. You can't adequately review and analyze whether the Parity Act has been violated without that information. From my perspective, drafting a complaint, it makes it much more difficult to draft a complaint that is as precise and is as persuasive and pleads as clearly and efficiently under Rule 8 a cause of action for And let me be clear, then, on your argument there. Your argument is that what you had in the complaint was sufficient, but to the extent that it was more skeletal than the district court would have liked, part of the problem was you didn't have the documents that have been provided that would have given you the actual criteria. That's exactly right, Chief Justice. Okay. All right. All right. And you claim you asked for those documents. We did. We did. Now, to be fair, the request was in language that, in hindsight, I wish had been a little clearer in terms of it was requesting, there was a request in one of the letters, at least, said, we want to get the medical necessity criteria that was applied to our case, including, and then it included both mental health and substance use disorder medical necessity criteria and med-surgical criteria. Well, the health net said, well, there was no med-surg applied to your case. Technically, that's true, but the point that we're trying to get at when we're talking about a Parity analysis is help them know exactly what we're asking for and why we're asking for it, and we believe it puts them on notice that they should have produced it. And the final rules of the Parity Act make clear these are documents that are necessary to be produced, and they are subject to production upon written request. Go ahead. It appears to me from reading the decisions from the District of Utah that if your case had been filed before a different judge in that district, the result would have been different. It seems to me they've got a direct conflict in their decisions. Am I reading that correctly? I think that's true, Judge McHugh. One of the things that the district court judges, I do a lot of these cases for better or worse over there, and one of the, more than one of the judges has said, are you getting some, helping us get some direction from the Tenth Circuit on this issue? Because there is some flux in the state of law. There is some need, I think they would agree, and I certainly feel there's some need for the Tenth Circuit to work on what is the guideline that should be used for purposes of pleading these Parity claims. And in terms of your Parity claim, it seems to me that there's two claims. One is a facial Parity Act claim, and the other is an as-applied claim. And I think we've mostly been discussing your as-applied claim. I have more trouble with your complaint on the facial Parity action, because that, I think, requires you to actually be pointing us directly to the terms of the policy that, on their face, distinguish, discriminate against mental health treatment. You're right, Your Honor. And that's why this is primarily, if not exclusively, an as-applied challenge. And some courts have gone so far, Judge McHugh used to say, all Parity claims are in the bottom line is that they're all applied challenges, because you have an application that results in disparity. If you just have it facially, but there's never an application that results in a disparity, there's no harm. So there's an argument to be made that it's all as-applied. Moving on to the question about the denial of benefits. On the wrongful denial of benefits claim, that was the first cause of action. We believe that there was an error there. We don't disagree that the standard overview is abuse of discretion. We think, though, that the district court erred in asserting that the plaintiffs were trying to have an evaluation under, quote, different medical necessity criteria when we presented the case in litigation from what was being discussed in the pre-litigation appeal process. And help me with this, because I've spent a good bit of time thinking about this aspect of your argument. When you look at what was presented in the administrative proceeding, when, and particularly I'm talking now about the request for an independent review, which was an extensive document, like 31 pages or something like that. In that document, it said, here's the evidence, including evidence of eating disorder. And I want you to apply medical necessity criteria of the plan to establish that I'm entitled to coverage. And specifically said, don't consider inter-qual criteria. Don't do that. Okay, well, why do you have a basis in the district court to then come in and say, well, under the inter-qual criteria, I qualify and satisfy that criteria because of my eating disorders. You didn't make that argument in the administrative proceeding, even in the alternative. You specifically eschewed the inter-qual criteria. So help me with why the district court is wrong in invoking Sandoval and saying you can't do that. Here's why, Your Honor. We were saying we need HealthNet to look at the medical necessity under the terms of the plan. We don't agree that the inter-qual criteria are accurate reflection of generally accepted standards or the terms of the plan. That's the MHPAEA argument, to some extent, the mental health parity argument. These two arguments are really closely interrelated. And we would ask, as a remedy, if you choose to reverse the district court on the mental health parity claim, it's necessary to also reverse that district court ruling on the denial of benefits because the two are inextricably linked. They're bound up. Help me with that. Why is that the case? I mean, you can have a remedy under the MHPAEA or the Parity Act claim without getting a remedy for this denial of benefits, right? I mean, at least the way your complaint is read, there's a separate basis for relief. Is that not true? That's true, Your Honor. All right, then. Then it seems to me that we don't, it's not an either or. And as it relates to the denial of benefits, as I said, I'm still waiting for an answer as to why you're not precluded. Because even if you made these arguments about eschewing the inter-qual criteria, mostly as it relates to the MHPAEA claim, there was nowhere that I saw where you articulated this sort of alternative, even under the inter-qual criteria, as it relates to eating disorder, I win. Which is what I understand to be your argument now. That's part of the argument, Your Honor. We, and when you look at this letter, the November 14, 2018 letter, the 31-page letter, as you referred to, it does take to task the inter-qual criteria. But then it says, you folks at HealthNet have said that we didn't satisfy the inter-qual criteria. We want you to do a medical necessity review, as it should be carried out. And at that point, when you have multiple repeated affirmations from HealthNet that you don't meet the inter-qual criteria, and here's why, boom, boom, boom, we believe that sets up the claim to argue before the district court when we argue. You're putting a fine point on it, but I'm not sure I'm going to be persuaded. But your fine point then is that you preserved it by saying that you need to conduct the medical necessity analysis the way it should be conducted. That would be your basis for saying that they should have applied the eating disorder inter-qual criteria, and you satisfy that. That's correct, Your Honor. All right. If I may? Hopefully, my colleague will give you a little rebuttal, but I have another question. No, please go ahead, of course. If you argue that even under the inter-qual requirements that they were met, and one of the things I have some confusion about is it looks like some of the things that you're relying on in terms of the comments about W were added after. The comments were added after the determination of the denial of benefits had already been rendered. What do we do with that? If it wasn't there? You mean the specific analysis that we go through, Your Honor, as to the elements? For example, let me find one where it was added after. There are several. So the sexually inappropriate behavior that was added after the denial, and there's another one that was added after the denial. And so I'm wondering how you can rely on comments that are made to the file after they've already rendered their decision as saying that the decision is wrong. Health Net's a fiduciary. They have an obligation to go through and act in the interests of the plan participants and beneficiaries and to see to it that individuals who are entitled to benefits get them. We were saying to Health Net, look, you fail to go through a competent analysis of the inter-court criteria. Now, we didn't say that in the pre-litigation appeal record in the same precision and specificity that we did before the district court, but the question about whether the care was medically necessary more generally was squarely before Health Net over and over and over again, and it's very troubling to me to see their reviewers, whether they're internal or external, replicate in a way that continues to make the same error over and over and over again in not following those inter-court criteria. Thank you. You'll be allotted some rebuttal. Thank you. Good morning, Your Honors. My name is Mike Lieberman. I am counsel for the appellees in this matter. I'm here with my colleague, Sam Roddy. May it please the court. Your Honor, I think there are three core undisputed facts in this case that really provide the backdrop for all of these discussions that you've heard from Mr. King and all of our briefs. The first of which is, what's the purpose of residential treatment? The purpose of 24-7 around-the-clock residential treatment is to, in the plaintiff's own words and as they acknowledge, to turn a corner, to allow the patient to turn a corner and move to a lower level of service intensity. The patient doesn't need to be cured fully. There can still be symptoms. In fact, if you look at the inter-court guidance for discharge to an outpatient program, a partial hospitalization program, that sort of discharge is warranted even if the symptoms remain severe, but support is able to be provided in monitoring or assistance during non-program hours. We would submit, Your Honor, that's what happened here. Number two, what we have here is a patient who had her services covered for five months of service at a residential treatment center. It's not the case, as you sometimes see, where someone enters a facility and a week later, the insurer says, we're not covering those services. She was there for five months. That's an extraordinary amount of time. Five months during Health Net's obligation to insure or the amount of time for the prior insurer. So Health Net was responsible for the latter two months of that stay and a prior insurer for the first three months. But she had been in the facility for five months. And then third is we have four different doctors here who looked at this patient's records and found it wasn't medically necessary for her to remain at that 24-7, around the clock, away from your family level of care. Two of those are internal to Health Net, two of those are external to Health Net. The first of those doctors came to her determination after doing a peer-to-peer conversation with one of the treating physicians before she reached that determination. And all of the doctors who looked at this record, looked at the totality of those circumstances and determined that a denial of benefits on and after that February of 2017 date was appropriate. And as we support... Lieberman, if I may, I want to go to the Parity Act for a quick second. Certainly. And I want to ask you the same question I asked opposing counsel. Because I'm trying to clarify what should be the operative standard that we should decide this case under. So let me just tick these things off and let me hear whether you think this test is appropriate. And this test would be one where... And we're talking 12B6 context now. There needs to be a plausible allegation of coverage. There needs to be an identification of a specific treatment limitation that applies to mental or substance abuse treatment. There needs to be an identification of an analog, a medical surgical care analog. And then there needs to be plausible allegations of a disparity. I agree with all four of those elements, Your Honor. What I would add to that last element, though, is that the test under parity is not only is the end result the same. Are these the same criteria that are being applied? But rather the test under parity are the processes, evidentiaries, standards, strategies, and factors to reach that determination disparate. And so I think that's an important distinction. And that's certainly an aspect that in the recitation that we have in the complaint here, there is no allegation one way or the other as to the processes to arrive at that determination. I don't know. I mean, I look at the allegations of the complaint and I understand, you know, I'm not an expert in this area. I understand exactly what they're saying. They're saying that if it's a mental health condition, you require the symptoms to be acute before you will approve residential treatment. But if it's a physical impairment, subacute is enough. So, Your Honor, on that point, I think that the label acute versus subacute, respectfully, as we read that, is simply a label. It is not. There is no definition necessarily around that term. And I think what's critical here. I mean, all we need. I mean, it's a 12B6 motion. You just need it's notice pleading. I mean, you need enough to put you on notice what the claim is and then you can explore it during the prosecution of the case. I just, you know, I found the decision. I think it was written by Judge Parrish. Is it Johnson? I mean, I thought it was very well written and analyzed and just walks through exactly what we need. And you pulled all the cards. You know, you've got all the information. And so you've got a situation where they're trying to plead what you do when they don't know precisely what you do. So, Your Honor, I think there's a couple of responses to that. The first of which is that on the definition of acute versus subacute, I don't think in our view it is enough to simply say that this is acute and this is not. You actually have to point to the plan language or the criteria or the specific criteria that you are labeling to be acute versus subacute. They didn't do that here. That would be a facial challenge, right? That would be the plan language challenge. But to allege it as an as-applied challenge as well, you still have to say what it is you think should have occurred here. What is the criteria that you are alleging is too acute versus subacute? What is the specific comparable processes to arrive at that language? Well, to Judge McHugh's point, you have that and they don't. And this is not a question in the 12 v. 6 context of labels as in legal labels. Why isn't this a statement of fact? I mean, yes, there needs to be meat to attach to the bone. But why isn't it a statement of fact to say you applied one standard? And it's not like these aren't terms of art at some level. You applied one standard to me and another standard to those who had medical surgical procedures. Why, for a parity claim, were you saying there was a disparity? Why isn't that enough? Well, Your Honor, I think that here, what you do need to do beyond what you describe is to actually point to the criteria that you think should have applied. If you don't think that this is industry standard or consistent with generally accepted standards of care, which is what the parity test is, are you actually applying consistently generally accepted standards of care to arrive at your medical surgical criteria versus your mental health benefits? Then you have to explain it. You have to identify the specific criteria. Here, they do none of that. They generally say that one standard is acute and one is subacute. But tell us what in that standard you're pointing to. And their point is that you had that information and they didn't. And so they asked you for it. You didn't give it to them. And so they weren't situated to do that. And so the Parity Act actually does have an answer to that, Your Honor. And that is that they can ask for it. They could ask for damages. But that doesn't mean that they couldn't also plead enough to put you on notice. And you know what they're claiming. You just described to us what they're claiming. Respectfully, Your Honor, I don't know what criteria they're pointing to other than interqual that they think is the more appropriate standard. What is it about the interqual criteria or about another standard that they think is more consistent with that generally accepted standard of care? Well, based on the administrative proceeding, it's not clear to me at all why you wouldn't understand that. In that 31-page document, they say apply the planned medical necessity criteria. Don't apply interqual. Whatever you, you know, it would seem that from that, to the extent that there was acute standards in interqual, why wouldn't you understand exactly what they're saying? Your Honor, respectfully, I believe that they have an obligation to identify the criteria other than interqual that they contend should reflect the generally accepted standards of care and provide the sort of standard that is appropriate for a comparison. Here, they don't provide that comparison. Isn't this the kind of stuff you get in discovery through experts? So, Your Honor, it could be if they had pled a complaint with sufficient facts that actually gets you past the pleading threshold. But here, they didn't. And I think it's really critical. But the pleading threshold is plausibility. It is. But, Your Honor, I think the critical aspect here, and you heard Mr. King talk about this, is that under the Parity Act, they do actually have an ability to ask for this material. You can go to your health plan and say, give us your comparative analyses. They didn't do that here. Well, quite apart from whether they did that or not. I mean, looking at just sort of 12B6 standards generally, apart from this context, if one were to say that, I mean, they did, if I recall correctly, in the complaint, they did speak to facilities. Well, they gave you a concrete example of an area where there would be disparate treatment. And so it's not like this was, well, I was treated less fairly than, you know, generally. They gave you one area where they said that your plan would result in a disparity with the condition that I have. Why isn't that enough for you to go look at what your criteria is in skilled nursing facilities? This is what we do over here. And you have an ability to make that determination. Why isn't that enough? Your Honor, our view is that you need to actually point to what in the criteria you're complaining is disparate. Yes, you can say with a broad swath, oh, it's different for skilled nursing, or it's different from what you do for residential treatment. But point us to the disparity you're complaining about. Well, they did. They said in the skilled nursing, you only require subacute symptoms for subacute facilities. In the mental health area, you require acute symptoms for subacute facilities. So our view, Your Honor, is... So your view is it's got to be more than that. They've got to spell out what criteria specifically we use in skilled nursing and what criteria specifically we use in mental health decisions. And that's all got to be in the complaint. It's to identify the language of the criteria that they believe is the comparison. Facial challenge, as I understand the difference. We're focused on an as-applied. Right. Understood, Your Honor. And as an as-applied challenge, they also need to point to the processes that we use to develop those criteria. There's none of that. And they need to point to... Where do you get that they have to refer to the processes we use to develop the criteria? Where is that in either ERISA, the Parity Act? I mean, I don't even see it in the case law dismissing these cases. Sure. Your Honor, we believe it's in the mental health parity final rules, which do require for a parity comparison, a comparison of the processes, evidentiary standards, factors, and strategies to arrive at the criteria that you are identifying as a comparator. That's not the standard of a complaint. That's the standard when you're trying to decide if their claim has merit. They're different. Your Honor, we think that the core of a parity complaint is identification of a comparison, a comparator with more specificity than simply saying this is acute versus subacute. And that's what we think the majority of the cases in the District of Utah and others have found. If they had given criteria under acute and subacute, would that satisfy the standard component of this processes standard? What I'm trying to understand now in particular is you added on to the four that I indicated as a possible test, the fifth. And I want a little bit of substance on what you're getting at with the fifth for a test, a possible test. And as it relates to that, would it have been enough as you see it? I take it it's not enough for a standard disparity for them to say acute, subacute in your view. So what would have been enough for them to invoke the standard component of processes standard, et cetera? If they had identified the specific criteria that they are claiming was acute versus not acute, and then described the difference in the application of those criteria that actually adds specificity to those labels, I would say that that would obviously be very fact specific, but that would be something you could look at and actually do an analysis of whether there is a stated parity challenge. But here, all we have is a straight, mere labels of acute versus subacute. And to us, Your Honor, that's not enough. So you think a parity claim has to be pled with specificity, like a fraud claim? Not with specificity, Your Honor. But you do need to identify the comparators that you are actually relying upon. Your Honor, I know with the remaining time, I do want to touch on just a couple of points on the ERISA claim for benefits. Well, one thing that was argued was that somehow the two are intertwined, and that if we were to disagree on the dismissal of the Parity Act claim, we necessarily have to reverse on the benefits claim, the denial of benefits claim. Do you agree with that? And if not, why? I believe they are two separately pled claims. I believe that you can uphold one and reverse on the other. Our position, of course, is that you should uphold on both, or affirm on both. But I do believe that they are separate. And I haven't heard the why yet. Why are they separate? I mean, why are they not so interrelated that you have to rule one way or another on both of them? The why is on a claim for benefits under ERISA. You have a... It's a question of, did you apply the specific mental health criteria that were actually applicable to this claim? And did you do so in a way that was reasonable, within the range of reasonableness? That is a different inquiry to us than, is there a comparable process on the medical surgical side that did not apply here, in this case? So, I'm sorry. No, go ahead. I want to make sure I understand. So, on the parity claim, you're essentially saying, we're challenging your criteria. But on the benefits claim, you take the criteria as it exists, and determine whether both they reasonably applied that criteria, and whether they, in giving you notice, reasonably explained how they applied that criteria. Yes, I think that's a fair summary, Your Honor. I know, I would just simply note, Your Honor, that I reiterate here that we do have four doctors who did apply that criteria here. I think the Tracy O case stands for the proposition that that is a high bar to overcome, to find that four different doctors were truly unreasonable in their application. I do think when you look at the record, they did look at the totality of the circumstances involving this particular plaintiff. That includes circumstances involving her eating disorder, notwithstanding the fact that we agree, they didn't bring that up front and center, certainly in their appeal letter. And so, we would ask you to affirm on that basis. Is the fact that the letters don't say anything about the eating disorder problematic? Problematic in what sense, Your Honor? In the sense that they don't give adequate notice as required under the statute? Yes, Your Honor. As to, well, I'm sorry. Do you mean the appeal letters? I mean your letters, Health Net's letters to the family saying, we're denying your claims. And then they set out, and we're denying it because you don't meet any of these. And they list part, but not all, of the standards. The first part of it is eating disorders. The second part of it is a list that has to happen within a week. And it appears from those letters that they skip that first eating disorder criteria and jump right to the others. And my question is, is the omission of any explanation of how they dealt with the eating disorders a problem in terms of compliance with your obligations with respect to notification? Right. So, I think I have a couple of responses, Your Honor. Number one is to say that I think it's important to point out that on this appeal, the plaintiffs are not contesting the procedural aspects of ERISA. They have conceded that the arbitrary and capricious component is satisfied here and that we did appropriately fulfill our obligations there. As to the question of whether the letters were sufficient, we think they were, Your Honor. While they did not use the word eating disorder, certainly the appeal letter talked about the many healthy coping skills this patient was exhibiting, that she was working on strategies to control her anxiety, which the record shows was connected in some ways to her eating disorder, that she was opening up significantly in therapy. And they actually say that she's beginning to address core issues related to her poor self-image and thinking errors. We do think that that put her on notice. Obviously, it put her on sufficient notice of the basis for our denial that she filed a 31-page appeal letter. Obviously, an external reviewer at that point considered it and decided that that was not sufficient to warrant a coverage of benefits here. I also think if you look in the record, there is citation after citation where the reviewers themselves did, in fact, look at her eating disorder and considered it carefully. And while they ultimately provided their conclusions in a summary form, there is nothing improper under ERISA in doing that. That's the Tracy O. case and the Mary D. case that we've cited in our briefing in particular. But you aren't making any concession on the district court's Sandoval point that they do not have a right to make the argument that your application of the intercourt criteria was flawed as it relates to eating disorders. That's correct, Your Honor. I think you articulated it well earlier. The district court ruled agreeing with you that the intercourt criteria, they expressly say the intercourt criteria should not be applied to this claim, and they never articulate anywhere. Even the simple sentence that says the intercourt criteria for eating disorders would justify a continued stay here. And they had the opportunity to do that. They had the intercourt criteria from the outset of the appeal process, both the first level appeal and the second level appeal. They could have articulated that argument if they wanted to. The whole purpose of the ERISA appeal procedure is to allow for those sorts of things to be vetted before it ever gets to the court. They simply didn't raise that argument. They waited until litigation to raise what we view as a newly minted argument. And unfortunately for them, the law says that you're not allowed to do that. You can't bring up something for the first time at the district court that you didn't raise below. As interesting as your argument is, Mr. Lieberman, I think we need to bring this to a close. And so we'll end it right there. And thank you, Your Honor. We are going to allow, and I may regret this, but we're going to allow five minutes of rebuttal. And you don't need to take it all. And let's go. Thank you, Your Honor. If I take it all, it will be because you thank me. Okay. Which I'm happy to answer any questions that you have. I just have two points. First, with regard to the motion to dismiss on the mental health parity claim. Paragraphs 20 and 21 do, in the complaint, do provide specific information that satisfies even what HealthNet today argues before you is necessary in a complaint. It talks about how the specific language of the denial letter constitutes the application of acute care criteria to subacute treatment in an improper way under the mental health parity statute. With regard to the second point, yes, they had four different doctors look at this case. And you hear HealthNet saying that over and over, both in their pleadings and in their argument today. But the fact is, what's really troubling about that is, despite the implication that these are independent reviews, they all make the same mistake, as Judge McHugh pointed out. None of them go through the interqual criteria as the interqual criteria themselves require. On the one hand, they want to say, well, it's just a summary. But on the other hand, they want to say, it was a completely principled and reasonable review. We did exactly what the interqual criteria called for. Over and over and over again, they fail to follow the interqual criteria. And when you say they failed to follow it, you mean because they don't refer to the eating disorder? Yes, they don't go through that. It's a very systematic approach. It's a checklist approach. They fail to do it. And that's why when we say, hey, please carry out a review of the medical necessity of this treatment that is appropriate under the terms of the plan, I think that's a fine enough characterization of their obligation. And your second line was, don't use the interqual criteria. Well, we had problems with the interqual criteria. And one has to wonder whether that allows you to be here now and critique how they apply the interqual criteria. I think it's an alternative argument. Thank you. Thank you. Case is submitted.